**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| Elliot Herron, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Case No. 19 CV 50176 |
| v. | ) | |
| | ) | Magistrate Judge Lisa A. Jensen |
| Brady Reveniq, | ) | |
| | ) | |
| *Defendant.* | ) | |

## REPORT AND RECOMMENDATION

For the following reasons, it is this Court's Report and Recommendation that Defendant's affirmative defense of failure to exhaust administrative remedies be denied. Any objection to this Report and Recommendation must be filed by July 20, 2021. Failure to object may constitute a waiver of objections on appeal. *See Provident Bank v. Manor Steel Corp.*, 882 F.2d 258, 260-61 (7th Cir. 1989).

## I. BACKGROUND

Plaintiff Elliot Herron, while an inmate at Dixon Correctional Center ("Dixon"), filed a *pro se* civil rights action in July 2019 pursuant to 42 U.S.C. § 1983. Dkt. 1. The complaint alleges that on February 12, 2019, at approximately 7:00 p.m., Plaintiff was watching TV in his cell and a group of inmates were gathered out in front of his cell making a lot of noise. Pl.'s Compl. at 6, Dkt. 1. Plaintiff asked the inmates if they would keep the noise down as he was trying to listen to his TV. *Id*. The inmates responded that if Plaintiff didn't mind his own business that they would beat him. *Id*. After the inmates left, Plaintiff went to the Officer's Control Bubble and reported to Defendant (Officer Reveniq) that he had been threatened by a group of inmates and was afraid for his safety. *Id*. Defendant responded that there was nothing he could do unless there was actual physical harm done by the inmates and advised Plaintiff not to worry about it because they were just blowing off steam. *Id*. at 7. Later that evening, Plaintiff was attacked by the same inmates that had threatened him earlier. *Id*.

The complaint named Defendants C/O Reveniq and Warden John Varga but the district judge, upon review of the complaint, dismissed and terminated Defendant Varga in September 2019. *See* Dkt. 13. Additionally, although Plaintiff set out two legal claims based on the above alleged facts, the district judge dismissed Plaintiff's intentional infliction of emotional distress claim and allowed Plaintiff to proceed solely on his Eighth Amendment claim. *Id*. For this remaining claim, Plaintiff asserts that Defendant's deliberate indifference to protecting Plaintiff from physical harm by other inmates caused him to suffer great physical injury and grievous bodily harm in violation of his Eighth Amendment right to be free from cruel and unusual punishment.

1

Defendant asserted the affirmative defense of failure to exhaust administrative remedies and completed limited discovery relating to that issue. On June 17, 2021, this Court conducted an evidentiary hearing on this affirmative defense pursuant to *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008). Prior to the *Pavey* hearing, the parties submitted briefing on the issue of exhaustion of administrative remedies.

### *Pavey* Exhibits

The parties introduced three exhibits into evidence. The first exhibit was the grievance at issue. In it, Plaintiff complained that on February 12, 2019 at approximately 8:00 p.m., he was attacked by a group of inmates and that, had Officer Reveniq been making his rounds as he should have, it is highly unlikely that the incident would have occurred. Plaintiff wrote that it was due to the lack of security by Officer Reveniq that he was "badly beaten" by the inmates. The date that the grievance was submitted is disputed; Plaintiff dated the grievance April 8, 2019, but it was stamped received in the grievance office on April 18, 2019. The counselor response section on the form was left blank. The second exhibit that was introduced into evidence was a memorandum from the grievance office dated April 17, 2019. The memorandum states that Plaintiff's grievance was being returned due to a failure to file within the appropriate timeframe. The third exhibit was the Return of Grievance or Correspondence form from the Administrative Review Board ("ARB"). The form indicates that the grievance was received by the ARB on May 1, 2019. The ARB recorded the grievance date as April 8, 2019 but returned the grievance without further redress because it was not submitted within the 60-day timeframe.

### *Pavey* Hearing Testimony

Defense counsel called two witnesses at the *Pavey* hearing. Defendant's first witness was Samantha Payne. She testified that she was previously employed as a correctional counselor at Dixon. Ms. Payne first testified about the correctional counselors' duties with respect to the grievance process. She stated that every weekday morning when the counselors got to work at 8:00 a.m., they went to their respective assigned housing units to pick up inmate grievances and brought them directly back to the grievance office. She stated that picking up the grievances was "the number one priority every morning." For inmates in the segregation unit, Ms. Payne testified that the counselor would announce their presence and, if an inmate had a grievance to submit, they would have it sticking out of their cell or through the crack in the door. Ms. Payne explained that she would log her name, date, and the number of grievances she picked up there that day.[1]

Ms. Payne testified that when grievances arrive at the grievance office, the counselors put them in a box. Later, the clerk goes through and reads each grievance. At that point, they are stamped with the date, assigned a grievance number, and logged in the "grievance log," which is an Excel sheet maintained by the grievance office.[2] Ms. Payne explained that the log includes the inmate's name and number, the grievance number, whether it is an emergency grievance, the date it is received, the date it is forwarded to the counselor, and the date it is returned to the inmate after the counselor's response. After an inmate's grievance is logged, it is sent to the counselor who is assigned to that inmate's housing unit. Ms. Payne testified that once a counselor gets their assigned

---

[1] The Court notes that a copy of this log was not introduced into evidence.
[2] The Court notes that a copy of the Excel sheet grievance log was not introduced into evidence.

grievances, they "do the research" for each one and put their response in the counselor response section.

When asked whether there was any mechanism to alert that grievances were not picked up from a particular section, Ms. Payne confirmed that there was. She explained that, when the counselors come back with the grievances they had picked up, the counselor would inform the grievance office clerk of which housing units they had visited. The clerk had a sheet of paper with every housing unit listed on it and would cross off the housing units reported by the counselors returning with grievances. If the clerk saw that a particular housing unit was not crossed off, they would notify the counselor or supervisor to ensure someone went by to check for grievances.

Defendant's second witness was Brett Wells. Mr. Wells testified that he is currently employed as a correctional counselor and grievance officer at Dixon, but he was not a part of the grievance office in April 2019. Mr. Wells first testified about the grievance procedure.[3] Relatedly, Mr. Wells testified that if an inmate is physically unable to fill out a grievance form on their own and requests a counselor or officer to assist them in filling out the grievance, then assistance is required to be given.

Mr. Wells also testified that a grievance is date stamped and receives a grievance number the same day it is received in the grievance office. He stated that, after a grievance is numbered, it is logged in the grievance log (the Excel sheet). Mr. Wells testified that grievances are also recorded in a program called CHAMP, which is maintained by the staff and used within the department to track things that happen with the inmate.[4] He explained that whenever a grievance is received in the grievance office, a memo is made in CHAMP under the inmate's name. When asked about how grievance numbers are assigned, Mr. Wells explained that grievance numbers are assigned consecutively based on when they are received in the grievance office. He stated that, as a result, a grievance that was received on a particular day would have the same date stamp as the grievances with numbers immediately preceding and following it. Based on his recollection, Mr. Wells testified that the grievances numbered directly before and directly after Plaintiff's grievance had the same date stamped on them – April 18, 2019.

Mr. Wells testified that, since the date of the incident that Plaintiff was complaining about occurred on February 12, 2019, Plaintiff would have been required to file his grievance by roughly April 12, 2019. He stated that the first box that appears on the grievance form, the date the inmate wrote the grievance, was left blank. He also stated, however, that there is a second place for an inmate to put a date, and that Plaintiff had written April 8, 2019 in that date box. Mr. Wells acknowledged that the counselor response section on Plaintiff's grievance was left entirely blank. He stated that there was no counselor response because the grievance was not filed within the 60-day timeframe, so it was technically never a grievance.

Mr. Wells testified about the memorandum from the grievance office. He explained that it is "basically a form letter" sent to inmates to let them know the status of their grievance. When

---

[3] The grievance procedure as it is laid out in the Illinois statute is explained in detail in the section below and Mr. Wells' testimony was consistent with the Illinois statute, so his testimony about the grievance procedure is omitted from this section.

[4] The Court notes that a copy of the CHAMP record was not introduced into evidence.

asked why the memorandum Plaintiff received was dated April 17, 2019 despite the grievance being stamped as received on April 18, 2019, Mr. Wells testified that this was "simply a typo." He testified that he was confident the grievance was truly received on April 18, 2019 because the date stamp and CHAMP entry reflect the same date.

Next, Plaintiff was called to testify by his counsel. He testified that he currently resides at Dixon and has been there for a little over three years. He testified that, following the events that took place on February 12, 2019, he was transferred to the segregation unit on the morning of February 13. When asked to describe his injuries from the February 12 incident, Plaintiff stated that both of his eyes were bruised and swollen, and he was "barely able to see." He testified that he could not really write due to his impaired vision. Plaintiff testified that he asked a counselor for assistance with physically filling out his grievance due to his vision impairment, but he did not receive assistance. Plaintiff testified that, while in the segregation unit, the inmates in the cells next to him were Charles Rogers and Stephen Sims. He stated that he was able to communicate with inmates in the cells next to him through the wall or windows.

Plaintiff testified that he asked for and received a grievance form on April 5, 2019. He stated that he knew it was April 5, 2019 because he had an accurate calendar and had been keeping track of the days until he would be released from segregation. Plaintiff stated that, after receiving the grievance form, he wrote out the grievance and held onto the form until the counselor came by. He testified that he filled out the relevant sections except for the date and signature boxes.

Plaintiff testified that no counselor came by to collect grievances on April 6 or 7, 2019. He noted that April 6 and 7 fell on a weekend. He testified that a counselor came by to collect grievances on April 8, 2019, and he is almost certain that it was Ms. Payne. He stated that he was made aware that Ms. Payne was coming around to collect grievances that day because she announced her presence. Plaintiff testified that, after hearing that she was there, he checked his calendar, hurriedly signed and dated the form, and slid it through the door for the counselor to receive. Plaintiff testified he was released from the segregation unit on April 12, 2019.

Plaintiff stated that he did not fill in the section on the grievance form listing the inmate's housing unit and bed number and that this section was blank when he turned it in on April 8, 2019.[5] Plaintiff testified that the housing information listed on the form (housing unit 31, bed 13) was not where he was located while he was in the segregation unit. He confirmed that this was the housing unit he was released to after he left the segregation unit on April 12, 2019. Regarding the memorandum from the grievance office, Plaintiff testified that he noticed the form was unusual because it was dated before the office had indicated it received his grievance. However, after he received the memorandum, he sent it to the ARB.

Plaintiff's next witness was Charles Rogers. Mr. Rogers testified that he was one of Plaintiff's neighbors in the segregation unit and that the two communicated while in that unit. He stated that he recalled Plaintiff's eyes looked bloodshot and swollen when he arrived in the segregation unit. Mr. Rogers testified that he was present when Plaintiff requested a counselor's assistance in filing a grievance and was subsequently denied that assistance. Mr. Rogers stated that

---

[5] Defendant did not contest this.

4

during the time he was in the segregation unit, until approximately March 11, 2019, he never witnessed Plaintiff receiving assistance with filling out a grievance form.

Plaintiff's final witness was Stephen Sims. Mr. Sims testified that he was sent to the segregation unit on February 12, 2019 and Plaintiff was in the cell next to his. He testified that they spoke while in the segregation unit and that they were able to communicate through the wall, door, or window. Mr. Sims stated that he believed a counselor was supposed to come to the segregation unit every day to pick up grievances but did not think they actually did so. He testified that the counselors did not make rounds on the weekends and he did not recall seeing a counselor come by on April 6 or 7, 2019. He recalled Ms. Payne coming into the segregation unit on April 8, 2019 and announcing that she was collecting grievances. Mr. Sims remembered standing at the door of his cell and recalled Plaintiff asking if he was going to turn his grievance in as well. He testified that he watched Plaintiff slide his grievance through the door to Ms. Payne and recalled that he spoke to Ms. Payne about other matters right after she picked up Plaintiff's grievance. He explained that he knew it was April 8, 2019 because he had a calendar in his cell and had been keeping track of the days and because he recalled that day was his brother's birthday.

## II. LEGAL STANDARD

The Prison Litigation Reform Act ("PLRA") requires inmates to exhaust available administrative remedies before filing a federal lawsuit concerning prison conditions. 42 U.S.C. § 1997e(a); *see Pavey*, 544 F.3d at 740; *Perez v. Wis. Dep't of Corr.*, 182 F.3d 532, 535 (7th Cir. 1999). To exhaust administrative remedies, an inmate must proceed through all steps of the institution's grievance process that are available to him. *Ford v. Johnson*, 362 F.3d 395, 397 (7th Cir. 2004). That means the inmate must grieve his complaint "using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (emphasis in original). The PLRA does not, however, set forth the procedures an inmate must take to exhaust administrative remedies at a particular institution; rather, the procedures are established by each institution. *See Jones v. Bock*, 549 U.S. 199, 218 (2007). The Seventh Circuit requires strict compliance with the PLRA's exhaustion requirement. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). An inmate "who does not properly take each step within the administrative process has failed to exhaust [administrative] remedies, and thus is foreclosed by § 1997e(a) from litigating." *Pozo*, 286 F.3d at 1024.

Failure to exhaust administrative remedies is an affirmative defense. *Jones*, 549 U.S. at 216. The burden, therefore, is on the defendant to prove by a preponderance of the evidence that an administrative remedy was available to the plaintiff and that the plaintiff failed to exhaust that remedy. *Jones v. Dart*, No. 14 C 1929, 2016 WL 1555588, at *2 (N.D. Ill. Apr. 18, 2016) (collecting cases).

State law determines the administrative remedies that a state prisoner is required to exhaust. *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016) (citing *King v. McCarthy*, 781 F.3d 889, 894 (7th Cir. 2016). The grievance procedures for the Illinois Department of Corrections ("IDOC") are set forth in the Illinois Administrative Code. Ill. Admin. Code tit. 20, § 504.800, *et seq*. An inmate must first submit a grievance to his counselor. 20 Ill. Admin. Code § 504.810(a). If the inmate is

not satisfied with the counselor's resolution, he must then file a formal grievance with his grievance officer. *Id.* A grievance must be filed with the counselor or grievance officer within 60 days after the discovery of the incident that gives rise to the grievance. *Id.* The grievance officer shall consider the grievance and report his findings and recommendations in writing to the Chief Administrative Officer. *Id.* § 504.830(e). The Chief Administrative Officer shall review the findings and recommendation and advise the offender of the decision in writing. *Id.* If, after the Chief Administrative Officer responds, the inmate still believes that the grievance has not been resolved to his satisfaction, he may appeal in writing to the IDOC Director. *Id.* § 504.850(a). The ARB, appointed by the Director, must receive the appeal within 30 days after the date of the warden's decision. *Id.* The ARB shall then submit a written report of its findings and recommendations to the Director, who shall review them and make a final determination of the grievance. *Id.* at § 504.850(d)-(e). An inmate does not exhaust his administrative remedies until the ARB rules upon his appeal. *See id.* § 504.850.

## III. DISCUSSION

Defendant argues that Plaintiff failed to exhaust his administrative remedies because he filed his grievance in an untimely manner. He contends that Plaintiff filed his grievance on April 18, 2019, and this is evidenced by the date stamped on the grievance as well as Mr. Wells' testimony that the grievances listed on the grievance log directly before and after Plaintiff's were also filed on April 18. Plaintiff responds that he timely exhausted his administrative remedies as required. In support of his argument, he points to his own testimony and Mr. Sims' testimony about turning in the grievance on April 8, 2019. He asserts that, after properly and timely submitting his grievance to the counselor, Dixon staff must have subsequently lost or held onto his grievance and eventually turned it in later. He argues that Dixon is responsible for any mishandling of his grievance, so it cannot be said that Plaintiff failed to exhaust his remedies. *See Dole v. Chandler*, 438 F.3d 804, 811 (7th Cir. 2006).

Plaintiff also makes the argument that Dixon staff thwarted him from taking advantage of the grievance process sooner when the counselor denied his request for assistance in filling out a grievance. He points to his own testimony as well as that of Mr. Rogers as evidence of the counselor's denial of assistance. Plaintiff contends that, had the counselor assisted him in filing a grievance as required, Plaintiff would have been able to file his grievance long before the 60-day period elapsed. Defendant argues that any claim that Plaintiff could file a grievance due to a disability or vision issues is irrelevant because he ultimately did file a grievance by the time he left the segregation unit.[6]

---

[6] In his closing argument, Defendant stated, "[t]his whole argument about whether or not Mr. Herron could file . . . a grievance because he was disabled or couldn't see . . . is irrelevant because he did file a grievance . . . By the time his segregation time was up, he was able to file [a] grievance as is evidenced by the grievance that he actually did file." This second argument is incompatible with Defendant's first argument. Defendant asserts that Plaintiff did not file within the 60-day period as required but also contends that Plaintiff filed a grievance before he left the segregation unit. Because Plaintiff testified that he was released from the segregation unit on April 12, 2019 – 59 days after the incident – Defendant's argument tends to corroborate Plaintiff's assertion that he timely filed within the requisite 60-day period.

6

As explained above, the relevant inquiry is whether Defendant has shown by a preponderance of the evidence that Plaintiff failed to exhaust his administrative remedies. *See Hernandez v. Dart*, 814 F.3d 836 (7th Cir. 2016); *Lloyd v. Dart*, No. 14 C 69, 2016 WL 232422 (N.D. Ill. Jan. 20, 2016). Having evaluated all of the evidence, the Court finds that Defendant has not met his burden.

The Court finds Plaintiff's testimony that he submitted his grievance on April 8, 2019 to be credible. *See Wilborn v. Ealey*, 881 F.3d 998, 1004 (7th Cir. 2018) ("At *Pavey* hearings, judges may hear evidence, find facts, and determine credibility.") (citing *Pavey v. Conley*, 663 F.3d 899, 904 (7th Cir. 2011)). The Court makes this finding based on Plaintiff's demeanor, the lack of inconsistencies in his testimony, the detailed nature of his testimony, and the fact that it is corroborated by other evidence. *See Pavey v. Conley*, No. 3:03-CV-662 RM, 2010 WL 4683609, at *2 (N.D. Ind. Nov. 12, 2010), *aff'd*, 663 F.3d 899 (7th Cir. 2011) (magistrate judge found plaintiff to be not credible based on inconsistencies in his testimony and his demeanor on the stand); *Davis v. Francis*, No. 07-CV-0693-MJR, 2009 WL 4894593, at *2 (S.D. Ill. Dec. 11, 2009) ("[P]laintiff's demeanor and the detailed way in which he testified were indicative of truthfulness."). During the evidentiary hearing, Plaintiff calmly and directly responded to questions and was not evasive in his answers. Plaintiff consistently contended throughout the hearing that he filed his grievance regarding the February 12, 2019 incident on April 8, 2019, that he signed and dated it immediately before turning it into the counselor, and that he knew what the date was because he had been keeping track of the days on his calendar while in the segregation unit. Further, he refuted that his grievance was untimely immediately upon learning that his grievance was being denied as such, by timely appealing the decision to the ARB. His hearing testimony also included specific details, such as the fact that he recalled requesting and receiving the grievance form on April 5, 2019 and that he had hurriedly signed and dated the grievance form immediately before turning it in to the counselor on April 8, 2019. Further, Plaintiff's testimony about his submission of the grievance was corroborated by Mr. Sims' testimony.

As noted above, Defendant offers two pieces of evidence to challenge Plaintiff's assertion that he submitted his grievance on April 8: the April 18, 2019 date stamp by the grievance office and Mr. Wells' testimony that logs maintained by the grievance office recorded Plaintiff's grievance as being received on April 18, 2019. However, the Court notes that there are several issues with this evidence and, as a result, finds it less persuasive.

With respect to the first piece of evidence, the date stamp indicating the grievance was received in the grievance office on April 18 does not necessarily refute Plaintiff's assertion that he filed the grievance with the counselor on April 8. Without more, it only serves as evidence of the date that the grievance was received or opened in the grievance office. As Ms. Payne, Plaintiff, and Mr. Sims all testified, the correct method of submitting a grievance while in the segregation unit was to slide it through the crack in the cell door. Once the grievance was picked up, Plaintiff had no control over the timing of its receipt in the grievance office. *See* Ill. Admin. Code tit. 20, § 504.810(a) ("A grievance must be *filed* with the counselor or Grievance Officer . . . within 60 days after the discovery of the incident.") (emphasis added); *Bradley v. Dennison*, No. 17-CV-862-MJR-SCW, 2018 WL 7204222, at *7 (S.D. Ill. Dec. 10, 2018), *report and recommendation adopted*, No. 17-CV-0862-MJR-GCS, 2019 WL 446512 (S.D. Ill. Feb. 5, 2019) ("Plaintiff had no way of ensuring that the grievance was placed in the grievance box or delivered to the counselor

due to his being in segregation. At that point Plaintiff had done all he could to exhaust his administrative remedies."); *Barghouti v. Pfister*, No. 12-CV-1258-JPG-DGW, 2014 WL 509328, at *4 (S.D. Ill. Feb. 10, 2014) ("[W]hile in segregation, [Plaintiff] placed his grievance between the bars and . . . once it leaves his hands, he has no control over what happens to the grievance. Plaintiff is not required to do anything more than submit his grievance for consideration in a timely manner.").

The reliability of the date stamp of April 18, 2019 is also undermined by the fact that the memorandum from the grievance office which informed Plaintiff that his grievance was untimely is dated April 17, 2019 – one day prior to the date the grievance was allegedly received. The Court acknowledges that Mr. Wells testified that the memorandum date was merely a typo. However, the Court does not find the testimony persuasive given that Mr. Wells was not the person who wrote the memorandum and he was not even working in the grievance office during the time at issue. Even if this Court were to credit Mr. Well's testimony that the memorandum contained a typo, errors with respect to dating grievance documents lend some support to Plaintiff's position.

Defendant's testimony that both the Excel log and the CHAMP log document that the grievance was received on April 18, 2019 is similarly unavailing. Mr. Wells testified that both these logs record when a grievance is received in the grievance office. They do not refute Plaintiff's testimony that he provided his grievance to his counselor on April 8, 2019 which is all he was required to do to timely file his grievance.

Perhaps the strongest evidence submitted by Defendant came from Ms. Payne, who testified that she worked as a grievance counselor in April 2019 and that her habit was to pick up grievances and bring them directly to the grievance office. Defendant argues that if the grievance was given to Ms. Payne on April 8, 2019 it would have, pursuant to her custom and practice, been delivered to the grievance office that day and date stamped accordingly. The Court certainly can rely on habit testimony as evidence that Ms. Payne acted in accordance with her practice on the date or dates in question. *See* Fed. R. Evid. 406. However, such testimony is accorded less weight here for several reasons. First, Ms. Payne has no independent recollection of picking up Plaintiff's grievance.[7] Second, even if Ms. Payne brought all the grievances she picked up on April 8, 2019 directly to the grievance office, her involvement ended there. She was not the one who date stamped the grievances. She could not testify to how grievances were handled once received in the office or the likelihood of grievances being misplaced. As such Ms. Payne's custom and practice testimony does not overcome Plaintiff's testimony that he submitted his grievance on April 8, 2019.

Because Plaintiff's testimony that his grievance was timely submitted was credible, and Defendant failed to provide evidence to directly refute Plaintiff's contention, the Court concludes that Defendant failed to meet his burden and that Plaintiff has properly exhausted his

---

[7] It is notable that Ms. Payne testified that when she picks up grievances from each housing area she makes an entry in a log that is kept in that housing area. In the log she records her name, the date, the location and the number of grievances she picked up. This log was not introduced into evidence nor did Ms. Payne testify that she reviewed this log to confirm whether she picked up grievances from the segregation unit on April 8 or from Plaintiff's housing unit on April 18, 2019.

administrative remedies. *See Hebron v. Baldwin*, No. 17-CV-6254, 2020 WL 757900, at *3 (N.D. Ill. Feb. 14, 2020) ("[A]bsent any conflicting testimony or other evidence presented by . . . Defendants, and given Plaintiff's testimony and [evidence], which this Court finds credible on this issue, this Court finds that Plaintiff has exhausted his [administrative remedies].").

It should be noted that neither Plaintiff nor the Court are advancing the assertion that Plaintiff's grievance was lost or mishandled due to any affirmative misconduct or malicious intent on behalf of the Dixon staff. The courts in the Seventh Circuit regularly work under the assumption that the mishandling of a grievance does not necessarily equate to malfeasance. Nonetheless, when a prison or jail administration loses a plaintiff's grievance, even inadvertently, a plaintiff will be found to have exhausted if they have done all that was reasonable to exhaust. *See Dole*, 438 F.3d at 811; *Span v. Chavez*, No. 15 CV 50063, 2018 WL 6048038, at *4 (N.D. Ill. Oct. 15, 2018), *report and recommendation adopted*, No. 15 CV 50063, 2018 WL 6046144 (N.D. Ill. Nov. 19, 2018); *Lacour v. Duckworth*, No. 317CV00453NJRDGW, 2018 WL 2356212, at *5 (S.D. Ill. May 24, 2018); *McLaughlin v. Freeman*, No. 2:08 CV 58, 2010 WL 1049878, at *3 (N.D. Ind. Mar. 16, 2010).

Because this Court finds that Plaintiff timely filed his grievance and has therefore exhausted his administrative remedies, it need not address Plaintiff's argument concerning Dixon's failure to assist him in preparing his grievance.

## IV. CONCLUSION

For the foregoing reasons, this Court enters a Report and Recommendation finding that Defendant has not met their burden in showing that Plaintiff failed to exhaust his administrative remedies.

Date: July 6, 2021          By: _Lisa A. _____

Lisa A. Jensen
United States Magistrate Judge

9